IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DENISE BROWN, *o/b/o* J. B., | ) | CASE NO. 1:15CV1325 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Denise Brown ("Brown"), mother of J. B. ("Claimant"), a minor, seeks judicial review of the final decision of Defendant, Commissioner of Social Security ("Commissioner"), denying her son's application for childhood Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 12.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

### I.  Procedural History

In August 2010, Brown filed an application for SSI on behalf of Claimant, alleging a disability onset date of December 12, 2009.  Tr. 13.  She alleged disability based on Claimant's following impairments: premature birth resulting in "apnea, GERD, Laryngeal penetration."  Tr. 13, 252.  After denials by the state agency initially (Tr. 85) and on reconsideration (Tr. 94), Brown requested an administrative hearing.  Tr. 128.  A hearing was held before Administrative Law Judge ("ALJ") C. Howard Prinsloo on April 12, 2012.  Tr. 98.  In his June 20, 2012, decision (Tr. 98-113), the ALJ determined that Claimant was not disabled.  Brown requested

review by the Appeals Council and the Appeals Council remanded the case to the ALJ for consideration of new and material evidence.  Tr. 118-121.

A second hearing was held before the same ALJ on September 19, 2013.  Tr. 58-77.  In his January 21, 2014, decision (Tr. 13-49), the ALJ determined that Claimant did not meet or medically equal the Listings.[1]  Tr. 17.  The ALJ then analyzed whether Claimant's impairment functionally equaled the Listings based on the Social Security Regulations applicable to child claimants, which provide that, for a child to "functionally equal the Listings," the child's impairment must be of listing-level severity; i.e. it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a.  The ALJ analyzed six domains of functioning and found that Claimant had no limitations in the domains of (1) acquiring and using information and (2) attending and completing tasks; and had less than marked limitations in the domains of (3) interacting and relating with others, (4) moving about and manipulating objects, (5) the ability to care for himself, and (6) health and physical well-being.  Tr. 19-49.  Because the ALJ found that Claimant did not have marked or extreme limitations, the ALJ determined that Claimant was not disabled as his impairments did not meet, medically equal, or functionally equal the Listings.  Tr. 17, 49.

Brown requested review of the ALJ's decision by the Appeals Council (Tr. 8-9) and, on May 14, 2015, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.  On July 2, 2015, Brown filed the instant action on behalf of Claimant seeking review of the Commissioner's decision.  Doc. 1.

## II. Evidence

---

[1] The standard for evaluating a child's disability claim is described below.  *See* footnote 5 and 6 and accompanying text.  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

## A.  Personal Evidence

Claimant was born in 2009 and was three years and nine months old at the time of the second hearing.  Tr. 16.

## B.  Relevant Medical Evidence[2]

Claimant was born on December 12, 2009, ten weeks premature.  Tr. 491, 385.  He was discharged from the hospital on January 20, 2010.  Tr. 418.  He had problems breathing and swallowing and he had reflux disease.  Tr. 436, 491.

On February 8, 2011, Claimant met with Help Me Grow Services for cognitive evaluation and assessment.  Tr. 537.  His adaptive/self-help skills were deemed out of range and his other developmental areas were assessed as "caution."  Tr. 541-542.  Occupational therapy and speech therapy were recommended.  Tr. 541-542.

On February 14, 2011, Claimant saw Occupational Therapist Amanda Sadowski for a feeding evaluation and for speech therapy. Tr. 626-627.  At the time, Claimant had a chronological age of one year, two months and a "corrected" age of one year.  Tr. 627. Sadowski observed deficits in Claimant's expressive language, speech sound and receptive language and noted that he produced minimal verbalization.  Tr. 626-627.  On April 20, 2011, a speech language therapy evaluation was performed by therapist Katie Walsh.  Tr. 630-631. Upon examination, Walsh found that Claimant's interaction skills were within functional limits, save a mild impairment in his ability for reciprocal communication.  Tr. 630.  His receptive language skills were mildly impaired or less, with the exception of a moderate impairment in his ability to imitate.  Tr. 630-631.  Walsh recommended therapy two times a month for four months.  Tr. 631.

---

[2]  Although Brown only challenges the merits of the ALJ's decision with respect to Claimant's mental impairments, *see* Doc. 14, there is some overlap between Claimant's mental and physical impairments.  Accordingly, the medical evidence relating to Claimant's mental impairments and relevant physical impairments is summarized herein.

On May 27, 2011, after three visits, Walsh reported that Claimant was "making wonderful progress with his goals."  Tr. 623-625.

On June 24, 2011, Claimant, 18 months old, saw Pediatric Neurologist Dararat Mingbunjerdsuk, M.D., for an evaluation of body shaking that occurred with reduced frequency as Claimant aged.  Tr. 504-506.   Dr. Mingbunjerdsuk noted that Claimant was currently saying five to six words and was using sign language for communication.  Tr. 504.  Brown reported that she believed Claimant understood her when she talked to him and Dr. Mingbunjerdsuk observed that he was interactive and playful.  Tr. 504.  Dr. Mingbunjerdsuk noted that Claimant drank from a sippy cup and that, although he still had difficulty holding a spoon, he was improving with the help of a therapist.  Tr. 504.  Upon examination, Claimant made eye contact and smiled. Tr. 505.  He was able to pull himself up to stand, walk and run.  Tr. 505.  He had mild decreased muscle tone in his bilateral upper and lower extremities, full motor power, and intact sensation. Tr. 505.  Dr. Mingbunjerdsuk diagnosed Claimant with mild hypotonia and observed that his episodes of body shaking could be secondary to jitteriness or signs of central nervous system immaturity rather than seizures.  Tr. 505-506.  She recommended an EEG, an audiology test due to Claimant's history of frequent ear infections, speech and occupational therapy at least once a week, and a follow-up visit in six months.  Tr. 506.

On August 2, 2011, when Claimant's corrected age was just under 18 months, a treatment note from Help Me Grow reported that Claimant's adaptive and self-help skills were out of range, although he showed improvement drinking from a sippy cup, bathing and "water play" and he was able to hold a spoon for scooping.  Tr. 543.  He was beginning to become aware of toileting and was helping to dress and undress himself.  Tr. 543.

A treatment note from Help Me Grow dated January 5, 2012, reported that Claimant had missed several therapy sessions because he had been ill with croup.  Tr. 602.  Brown complained that Claimant was still not eating a variety of foods and was "impulsive, biting, hitting, very active and not sleeping at night."  Tr. 602.  He did not like to be held or picked up.  Tr. 602. Brown was administering Clonodine to Claimant to help with his sleep on an irregular basis because she felt it made him groggy the next day.  Tr. 603.

On June 25, 2012, and July 3, 2012, when Claimant was 2 ½ years old, he participated in an Autism Diagnostic Clinic: a meeting with developmental behavioral pediatrician Nancy Roizen, M.D., behavioral analyst Julie Knapp, Ph.D., speech and language pathologist Kevin Mahon, M.A., and patient investigator Beth Mishkind, M.S.S.A., L.S.W.  Tr. 687-699.  Brown reported that Claimant had attended a preschool that was closing and that she intended to enroll him in a public preschool in the fall.  Tr. 688.  Upon exam, Claimant was described as "a busy child who seemed happy and smiles quite a bit" and "somewhat of a noisy player."  Tr. 689.  He used gestures to communicate, engaged in some basic pretend play, initiated joint attention, and frequently interacted with the adults in the room.  Tr. 690.  Brown expressed concern that Claimant had developmental language deficits, problems with playing and social skills, and behavioral problems such as aggression towards others and himself (hitting, biting, and scratching).  Tr. 689-690.  She reported that he pockets food in his cheeks and "nibbles food that needs to be chewed."  Tr. 688.  She stated that he did not dress or undress and that he used the toilet once or twice a week.  Tr. 688.  She complained he had reduced eye contact, difficulty responding to questions, and limited facial expressions to communicate.  Tr. 689.  She reported that he said fifty to seventy words that were unclear, could follow a one-step command, does not point to body parts when asked unless shown, and he does not sleep well.  Tr. 688.  The

examiners noted that, although Brown stated that he only spoke in fragments and had an inconsistent response to his name being called, they observed Claimant use a few full sentences "such as 'I did it' and 'Come on baby, let's go' to the baby doll" and responded the first or second time his name was called.  Tr. 689.   Brown also reported that Claimant has possible repetitive motor mannerisms, that he covers his ears to loud sounds such as fire trucks and in noisy restaurants, has daily temper tantrums, frequently challenges parental authority, is "hyperactive," does not spontaneously share with others, and is self-injurious and aggressive to others.  Tr. 688-689.  During the visit, Claimant played with his cars, engaged in basic pretend play, interacted with the team, and talked to the team and to Brown.  Tr. 823-824.

The team performed various standardized tests, including the Autism Diagnostic Interview ("ADI-R"), Autism Diagnostic Observation Schedule ("ADOS"), the Vineland Adaptive Behavior Scales, the Child Development Inventory, and the Conners' Parent Rating Scale.  Tr. 690-693.  Based on these tests, some of which required Brown's input, Claimant rated borderline on the autism spectrum per the ADI-R test and his ADOS results supported an autism spectrum diagnosis.  He scored moderately low on adaptive behavior, developmentally delayed on the child development inventory, and normal on the Conners' Parent Rating scale according to teachers but elevated-to-borderline according to Brown.  Tr. 691-693.  Claimant was diagnosed with provisional pervasive developmental disorder ("PDD"), mixed receptive and expressive language disorder, and was deferred a diagnosis of a personality disorder and/or mental retardation.  Tr. 693.  He was assigned a global assessment of functioning ("GAF") score of 61-70.[3]  Tr. 694.  The team recommended that Claimant return in six months for an updated

---

[3]  GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 61 and 70 indicates "some mild symptoms (e.g.,

evaluation to determine if his diagnoses "continue[d] to fit and for help in determining current intervention needs."  Tr. 694.  Brown was provided with a sleep hygiene handout and referrals to clinics for his physical problems.  Tr. 694.

On September 24, 2012, Brown and Claimant, 2 years and 9 months old, returned to Dr. Roizen and Mishkind to discuss Claimant's provisional diagnosis, which was causing some confusion.  Tr. 772-773.  Brown reported that Claimant's biting, kicking and tantrum behavior has worsened, he was "crazy and impulsive," he was throwing and destroying things, and he had started pica behavior such as eating hair, plastic and toothbrush bristles.  Tr. 772.  She also stated that he was chewing his fingernails and toenails to the point of bleeding.  Tr. 772.  Dr. Roizen observed that Claimant smiled and made good eye contact, though "it is very much on his terms."  Tr. 773.  Brown and Dr. Roizen "discussed how much of [Claimant's] behaviors are really related to his ability to communicate or converse."  Tr. 773.  Claimant had not been receiving speech therapy services over the summer because he had reached some of his milestones.  Tr. 772.  His behavioral counseling had been transferred to another entity that had not yet been able to offer services.  Tr. 772.  He had been prescribed melatonin and his sleep had improved somewhat.  Tr. 773.  Mishkind agreed to help Brown obtain services while cautioning that "it may be difficult to get services between now and when he turns 3, which is in December."  Tr. 773.  Claimant's diagnosis remained pervasive developmental disorder NOS, provisional; expressive receptive language disorder and sleep maintenance disorder.  Tr. 773.  His aggression was "felt to be secondary to the pervasive developmental disorder."  Tr. 773.

Brown returned to Dr. Roizen on October 25, 2015, complaining of Claimant's continued behavioral problems.  Tr. 769-771.  Dr. Roizen reported that Claimant was coming in every other

---

depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

week for speech therapy and, according to the therapist, was performing well and did not need

further treatment, although Brown stated that he was not improving.  Tr. 769.  Upon

examination, Claimant was "a bit self-directed," climbed on the trash can, crawled under the

table, and licked the carpet and rings on a pole.  Tr. 770.  He pointed to a clock and asked, "what

time is it mummy" and said, "help me name a plane."  Tr. 770.  He could point to body parts, a

window, and the door.  Tr. 770.  Dr. Roizen gave Claimant parts of the Slosson Intellectual Test

and the Peabody Picture Vocabulary Test.  Tr. 770.  Claimant, 2 years and 10 months old, scored

at about a 2 year level on the Peabody Test and answered most of the Slosson Test questions at a

2 ½ year level.  Tr. 770.  Dr. Roizen's treatment note stated that Brown was unable to get social

security, stating, "some of this is related probably to the fact that he is doing too well to get

social security although he has problems."  Tr. 770.  She diagnosed Claimant with status post

premature gestation, long-term swallowing problems, sleep onset problems, PDD NOS, and

mixed expressive receptive language disorder.  Tr. 771.  She recommended counseling, a sleep

clinic follow-up, and an appropriate individualized education program ("IEP") at a school.  Tr.

770.

      In November 2012, Claimant's mental health was assessed by Denise Green, LSW.  Tr.

802-814.  Brown reported continuing behavioral problems and that Claimant is fascinated with

lining things up in a row, such as his toy cars.  Tr. 812.  She also reported that Claimant often

played alone and had difficulty with coordination and fell often.  Tr. 812.  In the mental status

examination portion of the treatment note, based on Brown's reports, Green noted that

Claimant's appearance, intellectual functioning, speech, perception, thought content, and thought

processes were unremarkable, but that he exhibited decreased impulse control and frustration

tolerance, difficulty sleeping, and a labile and angry/hostile affect or mood.  Tr. 810-812.  Green

added disruptive behavior disorder NOS to Claimant's diagnoses and assigned a GAF score of 50.[4]  Tr. 812-813.

On March 5, 2013, Claimant, 3 years and 2 months old, again participated in the Autism Diagnostic Clinic.  Tr. 822-830.  He had recently started attending special education preschool.  Tr. 823.  Brown reported that Claimant had limited interactive play, aggression toward others, and self-injurious behavior.  Tr. 824.  The family/social history section noted that Brown had a slow growing brain tumor and was passing out from significant migraines and was also struggling with her twelve-year-old son.  Tr. 823.

The team observed Claimant playing with his cars, engaging in basic pretend play, and interacting with the team and Brown during the visit.  Tr. 823-824.  Brown reported that Claimant had continued difficulties with speech/language, socialization, and behavior.  Tr. 824.  He was falling asleep better but still struggled with maintaining sleep.  Tr. 823.  The team administered the same tests as before and made similar findings.  Tr. 824-828.  Claimant's ADI-R score was still consistent with borderline autism spectrum diagnosis but his ADOS score no longer supported an autism spectrum diagnosis.  Tr. 824-825.  He was diagnosed with mixed developmental disorder and speech disturbance NOS and was again deferred a diagnosis of a specific personality disorder and/or mental retardation.  Tr. 828-829.  The team recommended cognitive testing in the future.  Tr. 829.  Claimant was assigned a GAF score of 61-70 and it was recommended he have a six-month follow-up visit with Dr. Roizen; see an optometrist; go to a sleep clinic, feeding clinic, and GI clinic; have a neurological evaluation; continue behavioral therapy; participate in individual speech therapy and occupational therapy; and maintain his enrollment in school.  Tr. 829-830.

---

[4]  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  DSM-IV-TR at 34.

On March 27, 2013, Claimant, 3 years 3 ½ months old, saw Dr. Roizen.  Tr. 831-833.  He was enrolled in a preschool program with eight other children and he attended four days a week, two hours a day.  Tr. 831.  He was getting occupational therapy, physical therapy, and speech therapy.  Tr. 831.  Brown complained that Claimant "still did not know how to socialize by initiating play, yells and screams in busy, loud place[s] such as the grocery store, still obsesses with cars and their parts, still does not express wants needs [and] feelings, still does not know colors and is starting to wander."  Tr. 831.  She also reported "sensory issues" such as Claimant screaming when he touched "school things," hating having his hair washed, and that he stopped eating some foods that he used to like.  Tr. 831.  Dr. Roizen observed that, despite these complaints, Brown's notations on an Overt Aggression Scale indicated that Claimant exhibited aggression 3-4 times a week versus 5-10 times a week she had previously endorsed in September and October 2012 and, thus, was an improvement.  Tr. 831.  Dr. Roizen stated, "[Brown] has been successful in getting him an impressive number of interventions which has probably made a big difference in his ability to function."  Tr. 831.

Upon examination, Dr. Roizen called Claimant "a delight."  Tr. 832.  She remarked that he brought his cars, which he played with appropriately, and was not disturbed when she played with him a little bit.  Tr. 832.  He answered questions and appeared to think over the question and his answer more than he had done in the past, although he kept saying he was 2 years old, not the 3 years he had recently turned.  Tr. 832.  His Slosson Intellectual test results were at age level.  Tr. 832.  Dr. Roizen stated that, although he is qualitatively different in many ways and Brown and her family have concerns about his aggression, his aggressive behavior has lessened and his "developmental picture is improving."  Tr. 832.  She observed that he was able to answer questions that he would not have been able to answer a few months ago and that his "expressive

10

language is considerably better than his receptive after several months of a reasonable amount of services." Tr. 832.  He still needed more individual attention than the other students in his class but he was in the proper program.  Tr. 832.  She also stated, "Functionally, at school, he is much better" and "[h]e has made remarkable progress."  Tr. 832.  Dr. Roizen diagnosed developmental disorder, speech disturbance NOS, and sleep onset and maintenance disorder.  Tr. 833.  She recommended continued speech and occupational therapy, that Brown consider behavioral therapy for Claimant, and a six-month follow-up visit.  Tr. 833.

On April 3, 2013, Claimant saw genetic clinician Michelle Merrill, M.S., for a consultation about Claimant's physical development and concerns about myopathy.  Tr. 938-942. Merrill observed that Claimant "was alert, interactive, and followed commands very well for age."  Tr. 941.  She remarked that he appeared somewhat anxious, had limited eye contact, and spoke in short phrases; however, most of his speech was intelligible and he was aware of parts of the adults' conversation.  Tr. 941.  Merrill noted that a recent MRI of his brain revealed slight changes that "may be due to prematurity, or may be due to delayed myelination," and that recent IQ testing showed that he did not have an intellectual disability and that his interactions with her also demonstrated normal intelligence.  Tr. 942.

A June 4, 2013, treatment note from therapist Denise Green shows that Claimant's tantrums decreased from about five episodes a day to about two.  Tr. 950.  He still made minimal attempts to share, wait his turn, or follow directions without aggression.  Tr. 950.  He refused to demonstrate coping strategies by saying "no" or ignoring people.  Tr. 950.  Brown reported that Claimant mostly had tantrums when he was provoked or frustrated and attributed his perceived regression to "family stress and [Brown's] own inconstancy" with discipline.  Tr. 951.

On June 17, 2013, Claimant saw pediatrician Jessica Mondani, M.D., for a 36-month wellness visit.  Tr. 987-990.  Dr. Mondani noted that Claimant was age appropriate in multiple areas, including speaking up to 3 to 4-word sentences, being understood by others seventy-five percent of the time, and knowing his full name.  Tr. 987.  He did not do the following, considered appropriate for his age: know his sex, age, or dress himself.  Tr. 987.

**C. School Records**

On September 28, 2012, speech and language pathologist Michelle Pham evaluated Claimant and found that he had only a mild receptive and expressive language disorder and did not qualify for speech-language therapy.  Tr. 336-337.  She recommended he participate in a special education preschool program that offered group speech-language activities in the classroom.  Tr. 337.

On October 25, 2012, school psychologist Tom Rode, Psy.S., filled out an evaluation team report.  Tr. 332-335.  At the time, Claimant was 2 years, 10 months old.  Tr. 332.  Rode administered the Developmental Assessment of Young Children test, which is based primarily on parents' reports and also observations at school, and found that Claimant was functioning in the very poor to poor range in communication and adaptive behavior, at the age equivalent levels of a twenty-month-old and ten-month-old, respectively.  Tr. 334-335.  Rode also found that Claimant had below average social-emotional functioning at the age equivalent of a 19-month-old, had temper tantrums, insisted on doing things without help, showed his independence by running ahead of his parent and refusing to have his hand held, and spent most of his group time in solitary activities while watching other children.  Tr. 334.  He attempted to comfort others in distress and said "please" and "thank you," although he sometimes needed reminders.  Tr. 334.

On October 26, 2012, preschool intervention specialists Stephanie Marilla and Lucy Kimes recommended that Claimant interact with children his same age to promote socialization and language and skill acquisition.  Tr. 342-343.   Occupational therapist Jennifer Soros noted that Claimant needed to improve his attention to tasks and his transitions from preferred to non-preferred tasks.  Tr. 339.

An IEP social progress report contain the following notes from January 2013 regarding Claimant: when transitioning in the hallway, he needs several verbal prompts to get in line; he stays with the group and does not run in the hall; he did a better job standing behind a classmate; he began to ask for help from the teacher by calling the teacher's name and stating the assistance needed; he did a nice job interacting with his teacher; he joined others in play and began to make verbal requests for desired objects; and he started exploring a variety of free play options.  Tr. 300.  By March, he was sustaining play with a friend for a period of time moving around the classroom and his interests had expanded beyond his toy cars.  Tr. 301.  He transferred, without difficulty, from a preferred activity to a teacher-directed activity and "does a nice job of transitioning across all activities throughout the preschool day."  Tr. 301.  By May, he was doing a "nice job walking in the hallway with no more than 1 verbal prompt."  Tr. 301.  He was "doing a nice job interacting with his peers.  With a new student in the classroom, he will try to engage in play with her."  Tr. 301.  He "does a nice job transitioning between activities!"  Tr. 301.

An IEP adaptive progress report contains notes from January 2013: in three sessions, Claimant never indicated a need to use the bathroom, including one instance when he was soiled and required a diaper change.  Tr. 303.  He displayed a willingness to wash his hands but required two verbal prompts to complete his handwashing and required moderate assistance putting on his coat.  Tr. 303-304.  In March, he still did not indicate a need to use the bathroom,

but when taken to the bathroom when soiled he was able to undress and dress, take off his diaper, and use the toilet.  Tr. 304.  In May, his toilet use was unchanged, although he washed his hands independently in two out of three sessions, going directly to the sink after being changed.  Tr. 304.  He had required assistance pushing the faucet to turn on the water but "lately he has done a good job doing it."  Tr. 304.  He still required minimal assistance putting on his coat after one trial.  Tr. 304.

School records for the 2012-2013 school year show that Claimant made adequate progress in playing cooperatively and sharing with others, following class rules, and watching, listening and participating in group activities.  Tr. 352-353.  He had "mastered" following routine directions.  Tr. 353.  Preschool intervention specialists Marilla wrote, "[Claimant] is doing a nice job interacting with his teachers and peers" in January 2013.  Tr. 353.

**D.  Medical Opinion Evidence**

**1.  Treating Source Opinions**

On December 30, 2011, occupational therapist Amanda Sadowski completed a Medical and Functional Equivalence Questionnaire.  Tr. 525-528.  She had known Claimant since February 2011.  Tr. 525.  She opined that he has marked limitations in the areas of attending and completing tasks, moving about and manipulating objects, caring for self, and health and physical well-being. Tr. 526-527.  She found moderate limitations in the areas of acquiring and using information and interacting and relating to others.  Tr. 525-526.  She noted that Claimant is extremely sensitive to touch and textures and is an extremely picky eater who pockets foods and has decreased chewing abilities.   Tr. 527.  She stated that Claimant tests with a four-to-six-

month delay in fine motor skills, has a decreased attention span, and that he requires sensory interventions throughout the day in order to function.  Tr. 527.  She stated, "[Claimant's] disorder affects everything he does throughout the day.  Tr. 527.

On August 6, 2013, Green completed the same form, indicating that she had known Claimant for 9 ½ months.  Tr. 1001-1004.  She opined that Claimant had moderate limitations in moving about and manipulating objects; marked limitations in acquiring and using information, interacting and relating to others, and health and physical well-being; and extreme limitations in attending and completing tasks and caring for self.  Tr. 1001-1003.

On August 19, 2013, occupational therapist Amanda Frank, M.S., completed the same form, indicating that she had known Claimant for about 2 years.  Tr. 999-1000, 1005-1008. Frank found that Claimant had moderate limitations moving about and manipulating objects and health and physical well-being; marked limitations acquiring and using information, attending and completing tasks, and interacting and relating to others; and extreme limitations caring for self.  Tr. 1005-1007.  Frank noted that she could not comment whether Claimant suffered any side effects from his medications, stating, "I do not prescribe medications."  Tr. 1007.  She stated that he attends school but "has extreme difficulty transitioning."  Tr. 1007.  She stated that he was hypersensitive to sensory inputs, required extra time to adjust to situations, and "has very limited attention and is therefore very impulsive."  Tr. 1007.  In a letter dated August 23, 2013, Frank explained that Claimant has shown significant progress on standardized testing but still shows signs of clinical delay and is unable to generalize his skills to real life situations outside of therapy.  Tr. 999-1000.  When faced with real life situations, Frank stated that Claimant "will shut down and not respond or have a melt[]down."  Tr. 1000.

15

Also on August 23, 2013, speech pathologist Kristin Weaver, M.A., drafted a letter summarizing Claimant's therapy since April 2011.  Tr. 997-998.  Weaver reported significant improvement in Claimant's speech and language skills measured in structured therapy activities and standardized assessment measures.  Tr. 997.  She also stated that Claimant "continues to be severely impaired regarding functional communication, having great difficulty with functional comprehension and the ability to express his everyday basic wants, needs, and ideas."  Tr. 998.

### 2.  State Agency Reviewers

On October 8, 2010, state agency pediatric physician Malika Haque, M.D., reviewed Claimant's record.  Tr. 78-84.  Dr. Haque opined that Claimant had a less than marked limitation in physical well-being and no limitations in the remaining domains.  Tr. 78-84.  On February 21, 2011, pediatric physician Rachel Rosenfeld, M.D., reviewed Claimant's record and affirmed Dr. Haque's findings.  Tr. 86-93.

### D. Testimonial Evidence

On September 19, 2013, Brown appeared with counsel and testified at the hearing before the ALJ.  Tr. 63-76.  She stated that Claimant was born premature and had respiratory and digestive problems at birth and that these problems persist.  Tr. 63.  He is still a "little bit" underweight and is taking the supplement PediaSure, but they are still trying to find ways to get him to gain weight and eat better.  Tr. 63.  Because he has a "sensory processing disorder, ... once [] the taste is over, he just won't take in."  Tr. 63.  Also, because of muscle weakness in his hands and arms, he has trouble grasping the spoons and forks to try to feed himself.  Tr. 69.  As a result, he gets frustrated, his eating is thus interrupted, he loses interest, and Brown has to "bring him back down to ground zero because he's so frustrated."  Tr. 69.

Brown explained that Claimant is receiving occupational therapy, physical therapy, and speech therapy.  Tr. 65.  She stated that Claimant's occupational therapist and developmental pediatrician want him to have applied behavior therapy, which would "help him not have the meltdowns because he can't communicate his needs," but her insurance does not cover it.  Tr. 66. When Claimant cannot get people to understand him, he hits himself or bangs his head or pulls his hair out.  Tr. 66.  The last time he acted this way was two days before the hearing, when Brown was getting him ready for school.  Tr. 66.  He was trying to get her to understand something, she did not understand, and he pulled out a patch of hair on his head.  Tr. 66.  He also has scratches on his forehead because he was scratching out of frustration.  Tr. 67.

Claimant is in preschool and he has physical and occupational therapy while he is in school.  Tr. 67.  He also gets physical and occupational therapy at the hospital.  Tr. 67.  The focus of his occupational therapy is feeding himself and "getting past the sensory part of stuff" such as brushing teeth and different textures and temperatures of food.  Tr. 73.  He also does not like wearing a hat or putting on a coat, which they are working on because winter is coming.  Tr. 73.  Speech therapy has been limited "because, I guess, something changed over the summer for the criteria."  Tr. 67.  He gets one-on-one speech therapy once a week at the hospital.  Tr. 67-68, 71-72.  He also gets group speech therapy at school.  Tr. 72.  She has to find another avenue to get him one-on-one speech therapy "because he's at a plateau right now where he's not progressing with his therapies."  Tr. 68.  His school classroom is considered special education "for him;" there are "four peers like him and then four regular [] achieving students so that he can be around a regular surrounding as well as other children who are like him."  Tr. 68.

Brown stated that Claimant is not potty trained.  Tr. 68.  "He's not grasping how to tell me he has to go or to go before—to tell me before he has went."  Tr. 68.  They made a schedule

to try to get him to understand how to use the bathroom, which they have used since he was two years old, but it is not working.  Tr. 68.

Brown testified that Claimant has problems sleeping and wakes up five to eight times each night.  Tr. 69.  It is also hard for him to fall asleep.  Tr. 69.  He uses melatonin to help him calm down but it is not working.  Tr. 69.  He wakes up screaming and crying.  Tr. 69.  He argues and fights over toys with his older brother, who has ADHD and "temperament issues."  Tr. 70.  Claimant does not play with anything but cars, likes to line them up, and, if his older brother comes and knocks them out of line, Claimant will throw a temper tantrum.  Tr. 70.  Claimant has no friends at home or at school and does not know how to make friends.  Tr. 70.  He wants to play with them but does not know how, so Brown has to take his hand and set him down by the child and show him, for instance, by driving a car around.  Tr. 70.  Claimant, however, "still likes to just line [cars] up," other kids do not understand and mess up his line of cars, and Claimant has a meltdown or would rather go to a corner, sit by himself, and line up his cars and be alone.  Tr. 70.

### III. Standard for Childhood Disability

The standard for evaluating a child's disability claim differs from that used for an adult.  42 U.S.C. § 1382c(a)(3)(C); *see also Miller ex rel. Devine v. Comm'r of Soc. Sec*., 37 Fed. App'x 146, 147 (6th Cir. 20)02).  A child is considered disabled if he has a "medically determinable physical or mental impairment that results in marked and severe functional limitations and can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C).  To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process.  20 C.F.R. § 416.924(a).  At Step One, a child must not be engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  At

Step Two, a child must suffer from a "severe impairment."  20 C.F.R. § 416.924(c).  At Step

Three, disability will be found if a child has an impairment, or combination of impairments, that

meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt.

P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the Listings, the

Commissioner will assess the functional limitations caused by the impairment.  20 C.F.R. §

416.926a(a).  The Commissioner will consider how a child functions in six domains: (1)

acquiring and using information; (2) attending and completing tasks; (3) interacting and relating

with others; (4) moving about and manipulating objects; (5) caring for [oneself]; and (6) health

and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).  If a child's impairment results in

"marked" limitations[5] in two domains or an "extreme" limitation[6]  in one domain, the

impairments functionally equal the Listings and the child will be found disabled.  20 C.F.R. §

416.926a(d).

### IV. The ALJ's Decision

In his January 21, 2014, decision, the ALJ made the following findings:

1.     The claimant was born on December 12, 2009.  Therefore, he was an
older infant on August 4, 2010, the date [the] application was filed, and is
currently a preschooler.  Tr. 16.

2.     The claimant has not engaged in substantial gainful activity since August
4, 2010, the application date.   Tr. 16.

---

[5] A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or
complete activities.  20 C.F.R. § 416.926a(e)(2)(i).  A "marked" limitation is "more than moderate" but "less than
extreme."  Id.  "It is the equivalent of the functioning we would expect to find on standardized testing with scores
that are at least two, but less than three, standard deviations below the mean."  Id.

[6] An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate,
sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).  An "extreme" limitation means "more than marked."
Id.  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at
least three standard deviations below the mean."  Id.

3.    The claimant has the following severe impairments:  recurrent reactive airway disease and premature birth with provisional diagnosis of pervasive developmental disorder.  Tr. 16.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 17.

5.    The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.  Tr. 17.

6.    The claimant has not been disabled, as defined in the Social Security Act, since August 4, 2010, the date the application was filed.  Tr. 49.

In determining functional equivalence, the ALJ individually evaluated Claimant's abilities under all six domains of functioning and made the following findings:

1.  No limitation in acquiring and using information.  Tr. 20.

2.  No limitation in attending and completing tasks.  Tr. 26.

3.  Less than marked limitation in interacting and relating with others.  Tr. 25.

4.  Less than marked limitation in moving about and manipulating objects.  Tr. 31.

5.  Less than marked limitation in caring for himself.  Tr. 37.

6.  Less than marked limitation in health and physical well-being.  Tr. 42.

### V. Parties' Arguments

Although Brown objected to the ALJ's decision on two grounds presented separately, her arguments boil down to the following: the ALJ erred in his consideration of the opinion evidence of speech pathologist Kristin Weaver, occupational therapist Amanda Frank, and childhood therapist Denise Green, when reaching his conclusion that Claimant had less than marked limitations in two of the domains: interacting with others and caring for self.[7]  Doc. 14, pp. 11-

---

[7]  In one portion of her brief, Brown states, "The evidence establishes that Claimant has marked limitations in at least 2 domains: attending and completing tasks, interacting and relating with others, and caring for herself."  Doc. 14, p. 17.  She never mentions "attending and completing tasks" again, and the only "2 domains" she provides arguments to support are interacting and relating with others and caring for self.  Brown has therefore waived any

21. She asserts that substantial evidence supports a finding that Claimant has marked limitations in those two domains and specifically criticizes the ALJ for not giving good reasons for the weight he assigned to the aforesaid opinions. *Id*. In response, the Commissioner submits that substantial evidence supports the ALJ's decision and his evaluation of the opinion evidence. Doc. 18, pp. 15-27.

## VI. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### B. Substantial evidence supports the ALJ's decision in the domain "interacting and relating with others" and the ALJ did not err is his assessment of the opinion evidence

The ALJ found that Claimant has less than marked limitations interacting and relating to others. Tr. 25-29. Brown argues that Claimant has marked limitations interacting and relating to

---

purported attempt to challenge the ALJ's decision with respect to the domain attending and completing tasks. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (internal citations omitted)).

others.  Doc. 14, p.13.  She asserts that the ALJ's finding—that although Claimant exhibited difficulty in this domain, school records show that he is adapting and making progress—is "flawed as it completely fails to evaluate the necessary criteria for determining a marked impairment in this domain during the time period at issue."  Doc. 14, p. 13.  Brown then details evidence in the record she believes supports a finding that Claimant is unable to effectively communicate his needs or interact appropriately with others because of his developmental delay and speech disorder.  Doc. 14, p. 15.

The question before the Court is not whether substantial evidence supports a finding that Claimant functionally meets or equals a listing, but, rather, whether substantial evidence supports the ALJ's finding that Claimant does not functionally meet or equal a listing.  *See Wright*, 321 F.3d at 614.  Brown does not explicitly say what "necessary criteria" she believes the ALJ failed to evaluate in assessing Claimant's limitations in this domain.  The Court assumes that she is referring to the ALJ's treatment of the opinion evidence, which is the only finding by the ALJ that Brown addresses in her brief.  Brown's challenge is without merit.

The ALJ thoroughly explained why he found Claimant to have less than marked limitations in this domain and his explanations are supported by substantial evidence.  He detailed the notes from the autism clinic's evaluations in June/July 2012 and March 2013.  Tr. 25-26.  He discussed notes from individual visits with one of the evaluation team members, Dr. Roizen.  Tr. 25-27.  He reported the many instances of Brown's complaints recited in various treatment notes.  Tr. 25-29.  He talked about Claimant's school records and treatment notes from speech pathologist Michelle Pham and pediatric physicians who saw Claimant.  Tr. 27-29.

Notably, the ALJ cited the following evidence: when evaluated by professionals, Claimant was cooperative, showed interest in adults, and frequently initiated interaction.  Tr. 25,

26.  The frequency of his aggressive episodes, while still unacceptable, had diminished as he progressed.  Tr. 27.  Dr. Roizen, in October 2012, stated that Claimant "was likely doing too well to get Social Security despite having some problems."  Tr. 26.  In March 2013, Dr. Roizen described him as making remarkable progress.  Tr. 27.  She reported that his interventions made a big difference in his ability to function, he was involved in the right programs, his developmental picture was improving, and his expressive language was considerably better than his receptive language after several months of therapy.  Tr. 27.  In April 2013, a genetic clinician stated that she could understand most of Claimant's speech, noted that "recent IQ testing suggested no developmental disability," and declared that she agreed with this assessment based upon her observations.  Tr. 27.  A speech pathologist evaluated Claimant in September 2012 and found he had a mild receptive and expressive language disorder and that his condition did not qualify for school language therapy.  Tr. 28.  IEP notes from school described Claimant attempting to comfort others in distress and saying "please" and "thank you" with prompts.  Tr. 28.  He stayed with the group, lined up with his class (progressing from needing multiple verbal prompts in January 2013 to no more than 1 verbal prompt by May 2013), asked for help in the classroom appropriately, played with others, including a new student ("doing a 'nice job' interacting with peers"), interacted with his teacher, verbally requested desired objects, and progressed to transitioning smoothly between activities.  Tr. 28.  He made adequate progress playing cooperatively, sharing with others, following classroom rules, watching and participating during group activities, and following routine directions.  Tr. 28.  Claimant's pediatrician noted during his 36-month well visit that his speech was age-appropriate.  Tr. 25-29.

The ALJ stated that he gave persuasive weight to Claimant's teachers and the findings of his treating physicians and psychiatrists in evaluating his ability to interact and relate with others and accurately summarized what this evidence supports:

> While the claimant has exhibited difficulty in getting along with his classmates due to frustration and impulsivity, his school records show that he is adapting to a school environment as a very young child and appears to be making progress. Indeed, Ms. Brown admitted that the claimant's apparent regressions in behavior were attributable to family stress and her own failure to follow through with disciplinary measures. The claimant's treating physicians have found the claimant compliant and cooperative during examinations, and he has shown an interest in and initiated conversations with adults in various clinic settings. His speech and language development has also impacted his ability to relate to others, however, he has engaged in a special educational early childhood development program that includes group speech and language therapy and has been involved in individual speech and language therapy for a large portion of his young life. He has demonstrated improvement in his speech with these interventions. The undersigned gives some weight to the opinions of Ms. Weaver, as she indicates the claimant's progress and continuing need for therapy, but finds that her assessment of marked limitations appears to overstate the claimant's limitations given his treatment progress. The undersigned gives the opinion of Ms. Green no weight, as it is unaccompanied by information regarding her own observations or her evaluation of the voluminous evidence of record showing that despite his limitations the claimant is able to communicate with others and is improving with appropriate therapy. The evidence suggests that with continued behavior modification at school and home that will familiarize him with transition and social skills, and continued speech and language therapy, he will continue to improve his ability to communicate and relate with others. Based on the totality of the evidence, therefore, the undersigned finds that the claimant has a less than marked limitation in interacting and relating with others.

Tr. 29-30.

Brown argues that the ALJ "committed substantial error" when he considered the opinions of Weaver, Frank and Green.[8] Doc. 14, p. 18. She asserts that Weaver, Frank and Green are all treating sources and, thus, the ALJ is required to give good reasons for rejecting

---

[8]  Brown also asserts, "The ALJ's failure to properly articulate his reasons for failing to include Dr. Walker's opinion deprives this Court of the ability to conduct any meaningful review" (Doc. 14, p. 21) and refers to a "childhood disability statement[]" filled out by "Walker" (Doc. 14, p. 20). However, there is no "Dr. Walker" in the record of this case, although there is a neurology nurse practitioner Keionna Walker who conducted a 48-hour video EEG in February 2013 (Tr. 921). She did not provide an opinion. The Court assumes that Brown meant to say "Weaver" in these portions of her brief.

their opinions.  *Id.* (citing 20 C.F.R. § 404.1527).  Green and Frank, both therapists, are not acceptable medical sources and, therefore, the ALJ is not required to give their opinions deferential weight.  *See* 20 C.F.R. 416.913(a) (defining acceptable medical sources); SSR 06-03p, 2006 WL 2329939, at *4 (the factors in 20 CFR 404.1527 "explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources'").  Moreover, the ALJ explained that Green's opinion was not supported by her own observations and was inconsistent with the record as a whole.[9]  Tr. 30.  *See* 20 C.F.R. § 404.1527(c)(2) (when viewing opinion evidence from an accepted medical source, the ALJ considers the supportability and the consistency of the medical opinion evidence); § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.).  The ALJ recognized that Green was a licensed social worker and had a relationship with Claimant for 9 ½ months.  Tr. 26, 29; *see* 20 C.F.R. § 404.1527(c)(2) (ALJ considers the treatment relationship and the specialization of the source).  He observed that Green "made no comment with regard to [Claimant's] progress in therapy or of the frequency of his sessions."  Tr. 29.  Thus, even though he was not required to, the ALJ gave good reasons for discounting Green's opinion.

Although the ALJ did not state how much weight he gave to Frank's opinion, he clearly considered Frank's opinion and recognized she is an occupational therapist who had known Claimant for two years.  Tr. 29.  Thus, the ALJ complied with the regulations.  *See* SSR 06-03p, 2006 WL 2329939, *4 (the ALJ must consider all evidence, including opinions from non-acceptable medical sources).  Furthermore, elsewhere in his decision, the ALJ stated his reasons for the weight he gave to Frank's opinion and linked Green's opinion to Frank's opinion, explaining that both opinions found primarily marked or extreme limitations in all domains and that neither was supported by Green's or Frank's "own observations during treatment sessions or

---

[9] The ALJ observed that Green's diagnosis was based on symptoms reported by Brown.  Tr. 26.

by the medical evidence of record."  Tr. 49 (explaining the weight given to the opinions of Green and Frank in the domain health and physical well-being); 42 (giving no weight to the opinions of Green and Frank "as they overstate the claimant's limitations" and finding that Claimant has a less than marked limitation in his ability to care for himself); 36 (explaining that, in the domain moving and manipulating objects, the opinions of Green and Frank overstate Claimant's limitations and are contrary to his treatment records).[10]

Weaver, on the other hand, is a speech pathologist, an accepted medical source.  20 C.F.R. § 416.913(a)(5).  Thus, the ALJ was required to give good reasons for assigning "some" weight to her opinion.  *Id*.; *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). He did.  The ALJ recognized Weaver as a "Speech-Language Pathologist" who provided Claimant with speech therapy for over two years.  Tr. 29.  He explained that he gave weight to the portion of Weaver's opinion indicating Claimant's progress and his continued need for therapy but found that her assessment of his marked limitation was not supported by his progress derived from treatment, i.e., her opinion was not supported by her own observations and was inconsistent with the record as a whole.  Tr. 30.  Weaver's opinion was in the form of a letter stating that Claimant's functional communication was "severely impaired" and that he had great difficulty with functional comprehension and the "ability to express his everyday basic wants, needs, and ideas."  Tr. 998.  As explained above, the ALJ described, in thoughtful detail, record evidence demonstrating that Claimant made progress in his speech and his ability to transition between activities, follow instructions, ask for help, request desired objects, participate in group activities, and interact with teachers and peers.  Tr. 28.  He was cooperative during examinations, showed interest in his examiners and initiated interaction with them.  Tr. 29.  Treating physicians

---

[10] Indeed, Brown observes, "These opinions [of Green and Frank] are internally consistent and corroborate one another in support of a finding of disability."  Doc. 14, p. 20.

found his behavior and language improved, his pediatrician deemed his speech age-appropriate, and language and testing revealed an IQ establishing no intellectual disability.  Tr. 27, 28.  He was aware of parts of adult conversation.  Tr. 40.  He was enrolled in the proper programs and was expected to continue to improve as he developed further. Tr. 27, 30.  Thus, the ALJ explained the weight he gave to Weaver's opinion, his decision is supported by substantial evidence, and it must be affirmed.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (a court must uphold the ALJ's decision if it is supported by substantial evidence).

### B.  Because Claimant does not have marked limitations in two at least domains, he is not disabled

Having found that the ALJ committed no error in his decision that Claimant has less than marked limitations in the domain interacting and relating with others, the Court need not consider Brown's argument that substantial evidence supports a finding that Claimant has marked limitations in the domain caring for self.  Even if Claimant could be found to have marked limitations caring for self, as Brown asserts, he would not have marked limitations in two domains and, therefore, would not be disabled.

Regardless, the Court observes that the ALJ did not misstate evidence, as Brown alleges; in October 2012 it was stated that Claimant needed to increase his ability to put on and take off simple clothing (Tr. 388) and in May 2013 it was reported that he could pull his pants up and down without assistance (Tr. 304), as the ALJ accurately noted (Tr. 41).  The ALJ also correctly cited evidence that Claimant was able to wash his hands without assistance and that he still did not indicate a need to use the restroom and required minimal assistance putting on his coat.  Tr. 41, 304.  And, for the reasons explained above, the ALJ found the limitations assessed by Green and Frank to be inconsistent with other evidence in the record; namely, that Claimant's examining specialists found no evidence of a disorder requiring aggressive treatment, a

provisional autism spectrum disorder diagnosis was abandoned, no pediatrician found it necessary to implement more stringent developmental therapy than Claimant was already receiving, and it is likely, based on treatment notes, that Claimant will progress.  Tr. 41.

Because Brown cannot show that Claimant has marked impairments in two domains, as alleged, she cannot show that Claimant is disabled.  Accordingly, the ALJ's decision is affirmed.

## VII. Conclusion and Recommendation

For the reasons set forth herein, the decision of the Commissioner is **AFFIRMED.**

Dated:  March 31, 2016

Kathleen B. Burke
United States Magistrate Judge